F I L E D
United States Court of Appeals
Tenth Circuit

AUG 25 1989

ROBERT L. HOECKER
Clerk

**P U B L I S H**

UNITED STATES COURT OF APPEALS
TENTH CIRCUIT

———————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| vs. | ) | No. 87-2774 |
| | ) | |
| DAVID LANE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| vs. | ) | No. 87-2805 |
| | ) | |
| BRUCE PIERCE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 87-CR-114)

Jeffrey S. Pagliuca, Holland, Seelen & Pagliuca, Denver, Colorado, for Defendant-Appellant David Lane

Terri Harrington, Kane & Harrington, Denver, Colorado, (Mary A. Kane of Kane & Harrington, Denver, Colorado, on the briefs) for Defendant-Appellant Bruce Pierce

William R. Yeomans, Attorney, Department of Justice, Washington, D. C. and Thomas O'Rourke, Assistant United States Attorney (William Bradford Reynolds, Assistant Attorney General, Jessie Dunsay Silver, Attorney, Department of Justice, Washington, D.C., and Michael J. Norton, United States Attorney, Denver, Colorado, with them on the briefs), for Plaintiff-Appellee.

Before **HOLLOWAY**, Chief Judge, **SEYMOUR** and **BALDOCK**, Circuit Judges

———————

**HOLLOWAY**, Chief Judge

———————

I

On the night of June 18, 1984, Alan Berg was shot and killed in front of his Denver, Colorado home. Mr. Berg was a radio talk-show host and he was Jewish. A federal grand jury indictment charged defendants Pierce and Lane, as well as one Scutari and one Craig, with violating 18 U.S.C. §§ 245(b)(2)(C) and 2 in connection with Berg's death:

> On or about June 18, 1984, in the State and District of Colorado, DAVID LANE, BRUCE PIERCE, RICHARD SCUTARI, and JEAN CRAIG, aiding and abetting each other, by force and threat of force, willfully injured and interfered with Alan Berg because of his race, religion and national origin, that is, because he was Jewish and because he was and had been enjoying employment, and the perquisites thereof, by a private employer, resulting in the death of Alan Berg by gunfire.

> The foregoing was in violation of Title 18, United States Code, Sections 245(b)(2)(C) and 2.

The four defendants were tried jointly in the district court. The jury found Scutari and Craig not guilty; it found Pierce and Lane guilty. The trial judge sentenced Pierce and Lane to 150 years' imprisonment. Their appeals were companioned, and we now affirm their convictions.

II

A. Constitutionality of 18 U.S.C. § 245(b)(2)(C)

Before trial, Lane and Pierce filed motions to dismiss the indictment. They each contended that § 245(b)(2)(C) was unconstitutional as applied to them. The trial judge orally denied the motions. On appeal, Lane and Pierce contend that this

2

ruling was erroneous and reassert their argument that § 245(b)(2)(C) is unconstitutional as applied to them.

Lane and Pierce contend that § 245(b)(2)(C) is unconstitutional as applied to them because it attempts to regulate their purely private conduct, but was enacted solely upon Congress' power under the Equal Protection Clause[1] and § 5[2] of the Fourteenth Amendment empowering Congress to regulate only state action, and arguably private action interfering with use of a public facility, neither of which was involved here. They say the Commerce Clause, which the Government contends that § 245(b)(2)(C) is based upon, cannot support the statute because there were no legislative findings regarding the effect on interstate commerce of racial discrimination.

The government responds that § 245(b)(2)(C) was not based on Congress' power under the Fourteenth Amendment, but rather its power to regulate interstate commerce granted by the Commerce Clause.[3] The government contends that § 245(b)(2)(C) was designed to deter and punish private people who interfere with civil rights created by prior legislation -- specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, et seq. -- that had

---

[1]
    "No State shall deny . . . to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

[2]
    "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

[3]
    "The Congress shall have the Power . . . to regulate Commerce . . . among the several States . . . ." U.S. Const. art I, § 8. cl. 3.

been enacted pursuant to Congress' power under the Commerce Clause. The government says that Congress made ample findings regarding the effect of racial discrimination on interstate commerce in connection with enactment of the Civil Rights Act of 1964, and that no further independent findings are needed to support § 245(b)(2)(C).

Although the trial judge's oral ruling is not part of our record, his later comments show that his ruling upheld the government's position that Congress based § 245(b)(2)(C) on the Commerce Clause. During his rulings on later motions for acquittal, the trial judge said he "thought that Title VII itself was founded on the Commerce Clause, and that [§ 245(b)(2)(C)] was a subsequent statute to criminalize or to use the criminal sanctions to implement Title VII essentially." Supp. III R. 40.

## 1. The History of the Act

The history of § 245 is complicated, but consideration of it is necessary to determine which constitutional powers Congress invoked when enacting the statute. The genesis of § 245 is in section 2 of the Civil Rights Act of 1866. That section made it a federal misdemeanor for any person "under color of any law" to "subject or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act. . . ." Act of 9 April 1866, ch. 37, 14 Stat. 27. The "right[s] secured or protected by this act" were extensive and were enumerated in section 1.[4]

---

[4]

      Section 1 of the Civil Rights Act of 1866 provided:

(Footnote continued on next page)

4

Then in the First Enforcement Act of 1870, section 17, Congress re-enacted section 2 of the 1866 Act and also added a new section 6. Act of 31 May 1870, ch. 114, §§ 6, 17, 18, 16 Stat. 140. New section 6 of the 1870 Act made it a federal felony for two or more persons to "band or conspire together, or go in disguise on the public highway, or go on the premises of another . . . to injure, oppress, threaten, or intimidate any citizen with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or the laws of the United States . . . ." Act of 31 May 1870,

---

(Footnote continued):

> Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

Act of 9 April 1866, ch. 37, 14 Stat. 27. This statute, after many amendments, is now codified at 42 U.S.C. § 1981, see Runyon v. McCrary, 427 U.S. 160, 168 n.8 (1976), and its application to private acts of racial discrimination in the making and enforcement of private contracts has been recently reaffirmed. Patterson v. McLean Credit Union, ___ U.S. ___, 109 S. Ct. 2363 (1989).

5

§ 6. Section 6 of the 1870 Act did not require an act under color
of law; it sanctioned purely private conduct.

In 1909 Congress again amended and re-enacted sections 6 and
17 of the 1870 Act. Act of 4 March 1909, ch. 321, §§ 19 and 20,
35 Stat. 1092. In the 1909 Act Congress made a significant
amendment to section 17 of the 1870 Act (section 2 of the 1866
Act); the rights and privileges that the statute made it illegal
to interfere with, under color of any law, were changed from those
enumerated in the previous section of the statute (section 16 of
the 1870 Act and section 1 of the 1866 Act) to "any rights,
privileges or immunities secured or protected by the Constitution
and laws of the United States." Act of 4 March 1909, § 20.

Thus by 1909 Congress had made it a federal crime for a
person under color of any law to deprive any inhabitant of a state
of any right, privilege, or immunity secured or protected by the
Constitution and laws of the United States, and for two or more
persons by conspiracy, going in disguise on a public highway, or
on the premises of another, to interfere with any citizen in the
free exercise or enjoyment of any right or privilege secured to
him by the Constitution or laws of the United States. 18 U.S.C.
§§ 51, 52 (1940 ed.).

By 1966 these statutes had been further amended several times
and were codified at 18 U.S.C. §§ 241 and 242. Although these
statutes had been in force for one hundred years, the very general
way in which they described the rights and privileges protected
(any right or privilege secured or protected by the Constitution
or laws of the United States), among other things, created
enforcement problems. See S. Rep. No. 721, 90th Cong., 1st Sess.

6

5  (1967) reprinted in 1968 U.S. Code Cong. & Ad. News 1837;[5] H.R. Rep. No. 473, 90th Cong., 1st Sess. 4-5 (1967);[6] <u>United States  v. Guest</u>, 383 U.S. 745, 785-786 (1966)(Brennan J., concurring).[7] Congress therefore set out to create a more specific statute and eventually enacted § 245.[8]

---

[5]

    The Senate Report stated:

> "Worded in general terms, [Sections 241 and 242] apply to a whole range of Federal rights, including – without specification – rights under the 14th amendment. As a result, prosecutions under both statutes have been plagued by serious 'vagueness' problems, often requiring protracted litigation. Such delays seriously undermine enforcement efforts. And because these statutes do not spell out clearly what kinds of conduct are prohibited, they lack the deterrent effect that would result from plainly worded prohibitions." S. Rep. No. 721 at 5.

[6]

    The House Report stated:

> "There are other significant defects in section 241 of the Federal Criminal Code. The statute is worded in general terms. Section 241 prohibits interference with the exercise of 'any right or privilege secured * * * by the Constitution or laws of the United States.' But it is not always clear just what rights are secured or protected by the 14th amendment. . . . This problem can be migrated [sic] or largely avoided if the statute is reasonably specific with respect to the types of conduct prohibited." H.R. Rep. No. 473 at 3-4.

[7]

    "Section 241 is certainly not model legislation for punishing private conspiracies . . . . It deals only in general language . . . it protects in most general terms 'any right or privilege secured . . . by the Constitution or laws of the United States. Reliance on such wording plainly brings § 241 close to the danger line of being void for vagueness." <u>United States v. Guest</u>, 383 U.S. 745, 785 (1966)(Brennan J., concurring).

[8]

    The statutory language that eventually became § 245
(Footnote continued on next page)

## 2.  18 U.S.C. § 245(b)(2)(C)

Resolution of the parties' disagreement about the constitutional power that Congress invoked when it passed § 245 (b)(2)(C) -- the Fourteenth Amendment or the Commerce Clause -- requires consideration of the complex structure of § 245. The statute is divided into three subsections. Subsection (b) contains the substantive criminal provisions and is itself divided

---

(Footnote continued):

originated in Title V of the proposed Civil Rights Act of 1966. H.R. 14765, 89th Cong., 2d sess. (1966); H.R. Rep. No. 1678, 89th Cong., 2d Sess. 12-13 (1966). The 1966 Act was transmitted to Congress by the Attorney General in April 1966, approved by the House in August, and then died in the Senate. In June 1967 the House Judiciary Committee reported H.R. 2516 to the House. H.R. 2516, 90th Cong., 1st Sess. (1967); H.R. Rep. No. 473. The language of H.R. 2516 was substantially the same as Title V of the 1966 Act. The House passed H.R. 2516 in August 1967.

The Senate referred H.R. 2516 to the Committee on the Judiciary, which referred the bill to the Subcommittee on Constitutional Rights. The Subcommittee held hearings on H.R. 2516 in September 1967. See Hearings on S. 1026, S. 1318, S. 1359, S. 1362, S. 1462, H.R. 2516, and H.R. 10805 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 90th Cong., 1st sess. (1967). The Subcommittee had already been conducting hearings on another bill, the proposed omnibus Civil Rights Act of 1967. Title V of the proposed 1967 Act was substantially similar to H.R. 2516. Consequently, the Subcommitte in hearings in August and September 1967, regarding Title V of the proposed 1967 Act, considered the merits of H.R. 2516.

On November 2, 1967 the Senate Committee on the Judiciary reported an amended H.R. 2516 to the Senate and recommended that the bill as amended be passed. S. Rep. No. 721. The Senate debated H.R. 2516 as amended by the Committee on the Judiciary from January 18 through March 3, 1968. On March 3 H.R. 2516 as amended was passed by the Senate and returned to the House. 114 Cong. Rec. 5992. On April 10, 1968 the House, without further committee hearings or a joint conference, approved H.R. 2516 as it had been amended by the Senate.

H.R. 2516 as finally adopted was specific and comprehensive, undertaking to prevent interference with a broad range of rights and privileges secured by both on the Constitution and various federal laws. It is codified in title 18 § 245.

into five parts -- (1) through (5). Parts (1) and (2) of subsection (b) are further divided into five and six subparts -- (A) through (E) and (A) through (F) -- respectively. Each of these subparts criminalizes interference with specific protected activities.

The portion of § 245 that Lane and Pierce were convicted of violating provides:

> (b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with--
>
> (2) any person because of his race, color, religion or national origin and because he is or has been--
>
> (C) applying for or enjoying employment, or any perquisite thereof, by any private employer . . .
>
> shall be fined not not more than $1000, or imprisoned not more than one year, or both; and if bodily injury results shall be fined not more than $10,000, or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.

This "employment" provision within § 245(b)(2)(C) is the only portion of § 245 under attack here.


## 3. The Basis of Congressional Action

The Senate and House Judiciary Committee Reports[9] accompanying § 245 describe the statute's purpose and its constitutional foundation. In discussing the constitutionality of § 245's "employment" provision the Senate Report explicitly refers

---

[9]

"Although not decisive the intent of the legislature as revealed by the committee report is highly persuasive." N. Singer, 2A Sutherland on Statutory Construction § 48.06.

to the Commerce Clause and to the Civil Rights Act of 1964, which
includes Title VII and is based on Congress' Commerce Clause
power.[10]    The House Report that accompanied § 245 repeats almost

---

10

  The Senate Report states in part:

>       Acts of racial terrorism have sometimes gone
>   unpunished and have too often deterred the free
>   exercise of constitutional and <u>statutory</u> rights.
>
>   * * *
>
>       Depending upon the nature of the activity
>   involved, the constitutional basis for the bill
>   varies. It has long been settled that Congress may
>   make it a crime for any person (whether or not an
>   official or acting "under color of law") to
>   interfere with the exercise of rights . . .
>   created by Federal statutes enacted under article
>   1, section 8, of the Constitution. <u>Specifically,
>   there is no question of the constitutional power of
>   Congress to punish private interference with . . .
>   interstate commerce.</u> Thus, so far as the bill
>   vindicates rights based on article 1, section 8 of
>   the Constitution it is plainly not subject to
>   objection.
>
>       <u>Nor does any problem arise because, in a few
>   instances, the scope of protection is greater than
>   that afforded by the substantive statutes defining
>   rights dependent on the commerce clause.</u> Congress
>   is not constitutionally bound by the lines of
>   coverage announced in the Civil Rights Act of 1964,
>   with respect to . . . equal employment
>   opportunities. . . .
>
>       Indeed, it is all too clear that if racial
>   violence directed against activities closely
>   related to those protected by Federal
>   antidiscrimination legislation is permitted to go
>   unpunished, the exercise of the protected
>   activities will be deterred. A Negro prevented by
>   violence or the threat of violence from seeking
>   employment in a firm of less than 50 employees will
>   likely be too intimidated to seek a job with an
>   employer who is subject to the Civil Rights Act of
>   1964 . . . . Experience teaches that racial
>   violence has a broadly inhibiting effect upon the
>   exercise by members of the Negro community of their
>   Federal rights to nondiscriminatory treatment.

(Footnote continued on next page)

verbatim the language of the Senate report referring to the Commerce Clause and to the Civil Rights Act of 1964.[11]

Senator Hart, a leading sponsor of § 245 in the Senate,[12]

_____

(Footnote continued):

> Such violence must, therefore, be broadly prohibited if the enjoyment of those rights is to be secured. Legislation that regulates intrastate commerce in order to assure the effective regulation of interstate commerce is a commonplace, and its constitutionality is beyond serious debate. See especially, United States v. Darby, 61 S.Ct 451, 312 U.S. 100, 118-119, 85 L.Ed. 609; United States v. Wrightwood Dairy, 62 S.Ct. 523, 315 U.S. 110, 119, 86 L.Ed. 726; Atlanta Motel v. United States, 85 S.Ct. 348, 379 U.S. 241, 258, 13 L.Ed.2d 258. (emphasis added)

S. Rep. No. 721 at 4, 6-7.

11

The House Report states in part:

> The bill . . . is designed to deter and punish interference by force or threat of force with activities protected by Federal law or the Constitution. . . . [T]he scope of the activities described . . . is not limited to the scope of the "rights" created by other Federal laws outlawing discrimination with respect to those activities. Accordingly, in appropriate cases, . . . the bill would reach forcible interference with employment, regardless of the size and regardless of the public or private character of the employer. . . .

> [H.R. 2516] is based upon different sources of congressional power, depending upon the nature of the activity as to which forcible interference is prohibited. It has always been clear, of course, that Congress can provide criminal sanctions against persons (whether they are private individuals or persons acting 'under color of law') who interfere with the exercise of rights . . . created by federal statutes enacted pursuant to article I, section 8, of the Constitution. . . .

> Nor does any problem arise because, in a few instances, the scope of protection is greater than that based upon the commerce clause. In dealing with violent interference with the right to be free from racial discrimination in interstate activities it is reasonable to conclude that effective regulation requires reaching related local activities as well. Legislation that regulates intrastate commerce in order to insure the

(Footnote continued on next page)

discussed the constitutional basis of the bill during the Senate debates. Senator Hart's discussion is illuminating because it describes the portions of the bill supported by particular constitutional provisions. He states that the employment portion of § 245(b)(2)(C) is based on the Commerce Clause and also explains why the coverage of the "employment" provision of that statute is validly broader than the coverage of Title VII.[13]

_____

(Footnote continued):
effective regulation of interstate commerce is a commonplace, and its constitutionality is beyond serious debate. (See e.g., United States v. Darby, 312 U.S. 100, 118-119; United States v. Wrightwood Dairy, 315 U.S. 110-119; Atlanta Motel v. United States, 379 U.S. 241, 258 . . . .).

H.R. Rep. No. 473 at 3-5. (emphasis added)

12

"In the course of deliberations on a bill, legislators look to the sponsor and to the representative of the committee in charge of it, to be particularly well informed about its purpose, meaning, and intended effect." Sutherland at § 48.15 (citations therein).

13

Senator Hart stated:

Our power to enact H.R. 2516 derives from several sources, depending upon the victim's activity. It has long been settled that Congress may make it a crime for any person to interfere with the exercise of rights arising out of a relationship with the Federal Government or rights created by legislation enacted under article I, section 8, of the Constitution, which enumerates congressional powers. Thus this bill is plainly not subject to objection insofar as the activity interfered with is in the areas of Federal elections, employment, Federal jury service, common carriers, public accommodations, or federally administered or funded programs, facilities, or services.

Opponents to enactment concede all this, but would limit coverage with respect to employment, public accommodations, and common carriers to the scope of the substantive civil rights legislation we have enacted under the commerce clause.

(Footnote continued on next page)

Finally, Senator Ervin, the Chairman of the Subcommittee on Constitutional Rights and a forceful opponent of the bill in the Senate debates, criticized several provisions of § 245 - such as voting in purely State elections, attending public schools, participating in purely state activities, and serving on State

---

(Footnote continued):

> However, Congress is not constitutionally bound by the lines of coverage announced in the 1964 Civil Rights Act. These limits were based primarily on other considerations relevant to that measure, and were not compelled by the Constitution. But if the enjoyment of the rights affirmed in these existing substantive laws is to be secured, we must prohibit all racial violence which is likely to inhibit such enjoyment. If racial violence directed against activities closely related to those protected by the 1964 act is permitted to go unpunished, the exercise of the protected activities will also be discouraged.

> H.R. 2516 also would vindicate the right to the equal enjoyment of State facilities or programs, including, specifically, participation in purely State elections, in public education unassisted by the Federal Government, in employment by State and local agencies, and in State jury service.

> There is no question that Congress has the power under the enabling clauses of the 14th and 15th amendments to punish criminally State officials who forcibly seek to deny these rights.

> I am convinced that we have the power to reach private acts of racial violence intended to interfere with the exercise of 14th amendment rights. We have already made such a judgment, in enacting the criminal provisions of the 1965 Voting Rights Act, under the enabling clause of the 15th amendment. And six of the nine Justices of the Supreme Court, in the 1966 case of United States against Guest, have announced agreement with that judgment as applied to 14th amendment rights.

114 Cong. Rec. 2267-2268. (Emphasis added). Thus we are persuaded that the employment provision, vis-a-vis clearly interstate, as well as related local activities, was grounded on the Commerce Clause.

13

court juries — as exceeding Congress' power under § 5 of the Fourteenth Amendment. 114 Cong. Rec. 389. But when comparing his proposed substitute to the bill recommended by the Committee of the Judiciary, Senator Ervin conceded that "[p]rotection from violent interference in the rights of employment conferred by title VII of the 1964 Civil Rights Act are included in both versions." 114 Cong. Rec. 391.

On the basis of the statutory predecessors to § 245, the Senate and House reports that accompanied § 245, and the statements by Senators on the floor, we conclude that Congress was satisfied that the broad prohibition in § 245(b)(2)(C) of racially motivated interference with employment was necessary to secure the federal statutory right to equal employment opportunities provided by Title VII pursuant to its Commerce Clause power, and that Congress intended to invoke that power when it enacted § 245(b)(2)(C), extending the protection to "related local activities as well."

While we hold that Congress invoked its commerce power to support § 245(b)(2)(C), we recognize, as Lane and Pierce point out, that in the Subcommittee hearings and the Senate debates there is much discussion about the limits of Congress' power under § 5 of the Fourteenth Amendment. See 114 Cong. Rec. 389-391, 540-543, 913-915, 1033, 1281-1283. Further, the Senate and House Reports clearly state that Congress invoked the Fourteenth Amendment to support other provisions of § 245. Senate Report No. 721 at 7-8; House Report No. 473 at 6-7. However, there was also argument in the debates and hearings that § 245's "employment" provision was supported by Title VII and the Commerce Clause. See

14

114 Cong. Rec. 928,1026, 1029, 2268-2269, 5204; but see 114 Cong. Rec. 536-537. After reviewing the legislative history, we find it less clear as to whether Congress also may have relied on the Fourteenth Amendment in addition to the Commerce Clause in enacting § 245(b)(2)(C). We do not need to resolve this uncertainty, however, or express an opinion on whether Congress' Fourteenth Amendment power would support § 245(b)(2)(C). Since the Commerce Clause power was invoked and is sufficient for our decision, we have considered it alone. See Heart of Atlanta Motel v. United States, 379 U.S. 241, 250 (1964).

Lane and Pierce nevertheless contend that even if Congress may have intended to invoke its Commerce Clause power, the statute is nevertheless unconstitutional because Congress did not validly invoke that power; "there is absolutely no legislative history which reflects that Congress made any findings about racially motivated interference with employment and its effect on interstate commerce." Brief of Appellant Lane, 15-18; Brief of Appellant Pierce, 13-17. However, Congress is not required to make "particularized findings in order to legislate." Perez v. United States, 402 U.S. 146, 156 (1971); see Heart of Atlanta Motel, 379 U.S. at 252. Congress heard extensive evidence on the burdens that racial discrimination places on interstate commerce in connection with its enactment of the Civil Rights Act of 1964. See id. (citing at length the legislative history). We see no reason why Congress could not rely on that evidence, as it expressly did, to support § 245(b)(2)(C).

Lane and Pierce also contend that their convictions must be reversed because the statute does not require, nor was the jury in

15

this case required to make, a finding that Berg's killing affected interstate commerce. When Congress enacts a statute under its commerce power, it is not constitutionally obligated to require proof beyond a reasonable doubt that each individual act in the class of activities regulated had an effect on interstate commerce. "Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." Fry v. United States, 421 U.S. 542, 547 (1975).

In sum, we hold that Congress possessed ample power under the Commerce Clause to enact the § 245(b)(2)(C) "employment" provision, and that Congress validly invoked that power, although as noted Congress may also have relied on its power derived from the Fourteenth Amendment. If in an effort to rid interstate commerce of the burdens imposed on it by racial discrimination Congress may prohibit a person from denying another person equal employment opportunities by refusing to hire him or by firing him solely because of his race, then Congress may also prohibit a person from denying another person equal employment opportunties because of his race by violently injuring or killing him. Thus the statutory provision is constitutional as applied in this case.

### B. Double Jeopardy

In December 1985, before trial on this § 245(b)(2)(C) charge, Lane and Pierce were convicted of RICO offenses under 18 U.S.C. §§ 1962(c) and (d) where one element was the alleged participation in Berg's killing. They contend that their prosecution and

16

conviction for allegedly killing Berg in violation of the RICO statute bar any subsequent prosecution pursuant to 18 U.S.C. § 245. They argue, <u>inter alia</u>, that Congress did not intend such multiple federal prosecutions and that, under the unique circumstances of this case, we should abandon our "formalistic approach" and apply double jeopardy principles under the "same transaction" test because this prosecution concerned the same statements, acts and observations as the RICO case. Pierce's Opening Brief at 41, 46; Lane's Opening Brief at 44, 49.

We disagree. In rejecting a similar double jeopardy claim, we have held that there was nothing in the RICO statutory scheme suggesting that Congress intended to preclude separate convictions or sentences for a RICO offense and for the underlying predicate crimes making up the racketeering pattern. <u>United States v. Hampton</u>, 786 F.2d 987, 979-980 (10th Cir. 1986). And we have recently rejected a request that we abandon the "same evidence" test for the "same transaction" approach. <u>United States v. Genser</u>, 710 F.2d 1426, 1429 n.3 (10th Cir. 1983). There were clearly separate offenses in that the RICO prosecution required proof of a pattern of racketeering activity and the homicide, while here the racial motivation and employment element had to be proven, in addition to the homicide.


### C. Comment on Lane's Postarrest Silence

After Lane was arrested and given <u>Miranda</u> warnings he was interrogated by an F.B.I. agent. At Lane's trial the following exchange occurred when the prosecutor was presenting the testimony of that agent:

Q. And after arresting Mr. Lane, what did you next do with him?

A. I took him to the Forsyth County sheriff's office in Winston-Salem, North Carolina.

Q. Did you interview him there?

A. I did.

Q. Did you advise him of his rights there?

A. Yes.

Q. Did he -- he understood his rights?

A. He did.

Q. Did he say he would answer questions?

A. He did to a limited extent.

Q. Did he say he would answer questions but not others?

A. That's true.

XX R.57-58.

At this point, Lane's counsel objected and moved for a mistrial on the ground that the prosecutor's question and the witness' answer violated Lane's Fifth Amendment right to remain silent after arrest. The trial judge denied the motion, but sustained the objection and immediately instructed the jury not to draw any adverse inference from the testimony.[14] After this

---

[14]

The judge instructed the jury as follows:

THE COURT: Members of the jury, before proceeding further with this witness' testimony, I am going to instruct you that you must strike from your minds and disregard the comment included in the question or the question itself and the implications from it that in response to inquiry from this F.B.I. agent, Mr. Lane agreed to answer some questions and not answer others. You cannot infer anything from this question and the answer that he declined to answer any questions.

(Footnote continued on next page)

instruction, Lane's counsel objected again and moved again for a mistrial, arguing that the instruction reenforced the prosecutor's comment.   The motion was denied.   The prosecutor did not again

---

(Footnote continued):

> The reason is, the Fifth Amendment to the Constitution of the United States and the absolute right to remain silent when having been arrested and then questioned by a law enforcement officer.

> There was reference, and I'm sure you have heard before of the Miranda right, which refers to the Supreme Court decision of the United States Supreme Court called <u>Miranda against Arizona</u>.   That case held and it's long been the law that when a person is arrested, placed in custody by a law enforcement official, the person must be advised of what his rights are under the Constitution of the United States, and the fundamental right involved is the absolute right to remain silent.   It's the same right that is involved in the presumption of nonguilt that is involved in trial.

> It's the same right that says no person accused of any criminal offense has any burden or duty of proving anything and, in this case, it was not inappropriate for [the prosecutor] to ask a question, did he answer some questions and not others.

> So, what I'm saying to you, I'm saying in the strongest terms possible.   You must eliminate from your mind any inference or suggestion that might arise from the notion that Mr. Lane refused to answer some questions because he had anything to hide.   All that Mr. Lane did was exercise the right that you share with him as any person living under the Constitution of the United States shares with all other persons living under the Constitution of the United States, which is you don't have to say anything to a law enforcement officer that asks you any questions.   You can refuse to respond to any questions and, of course, if you respond to a question or two, you don't have to answer any others.

> So, it would be a violation of your oath as jurors in this case for you to make any inference or suggest that there was anything wrong with Mr. Lane's refusal to answer questions or that he had anything at all to hide from this F.B.I. agent and

(Footnote continued on next page)

refer to Lane's postarrest silence. Lane contends "[t]here can be no question that the prosecutor's questioning violated [Lane's] Fifth Amendment rights." Brief of Appellant Lane, 37. We disagree.

In <u>Doyle v. Ohio</u>, 426 U.S. 610, 619 (1976), the Supreme Court first held that "the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving <u>Miranda</u> warnings, violated the Due Process Clause of the Fourteenth Amendment." The holding of <u>Doyle</u> rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial. <u>Greer v. Miller</u>, 483 U.S. 756, 763 (1987); <u>see also</u> <u>Johnson v. Patterson</u>, 475 F.2d 1066 (1973).

In <u>Greer</u>, the prosecution began cross-examination of Miller, who had taken the stand and denied involvement in the crime, as follows:

> Q. Mr. Miller, how old are you?
>
> A. 23.
>
> Q. Why didn't you tell this story to anybody when you got arrested?

483 U.S. at 756. Defense counsel immediately objected and requested a mistrial. The trial judge denied the motion, but immediately sustained the objection and instructed the jury to "ignore [the] question, for the time being."

---

(Footnote continued):
        counsel will avoid such comments or questions that generate any such inference.

XX R. 60-62.

The prosecutor did not pursue the issue further, nor mention it in his closing argument. At the conclusion of the evidence, defense counsel did not revert his objection or request an instruction on the prosecutor's question. Moreover, the trial judge specifically instructed the jury to "disregard questions . . .to which objections have been sustained." Id. at 759. The Supreme Court held "that the sequence of events at the trial, beginning with the single comment -- but including particularly the proper and immediate action by the trial court, and the failure by defense counsel to request more specific instructions -- indicates that [the defendant's] postarrest silence was not used against him within the meaning of Doyle." 483 U.S. at 764 n.5.

The sequence of events here is similar to Miller. Two questions revealed the fact that Lane declined to answer some postarrest questions. His counsel immediately objected and requested a mistrial; the trial judge sustained the objection and forcefully admonished the jury to disregard the comment included in the question and the question and implications from it. The prosecutor did not again mention Lane's postarrest silence. The prosecutor's conduct is most regrettable and should not have occurred. Nevertheless, we hold that grounds for a reversal under Doyle are not shown.

## D. Sufficiency of the Evidence

At the close of the evidence, Lane and Pierce moved for judgments of acquittal. They argued there was not sufficient evidence, as required by the Due Process Clause, of certain

21

elements of a § 245(b)(2)(C) violation.  II R. 124.  They contend the trial judge erred when he denied their motions, reasserting their argument that there was insufficient evidence of certain elements of the crime.  II R. 124.

Evidence is sufficient to support a criminal conviction if, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); In re Winship, 397 U.S. 358, 361-364 (1970); United States v. Culpepper, 834 F.2d 879, 881 (10th Cir. 1987).  If there is not sufficient evidence of each element of the crime the trial judge must grant a motion for acquittal.

The prosecution was required here to introduce sufficient evidence of three elements.  First, Pierce and Lane must have "by force or threat of force willfully injure[d], intimidate[d], or interfere[d] with, or attempt[ed] to injure, intimidate or interfere with" Berg.  § 245(b).  Second, they must have done so "because of his race, color, religion or national origin . . . ." § 245(b)(2).  Third, they must have done so "because he is or has been applying for or enjoying employment, or any perquisite thereof, by any private employer . . . ."  § 245(b)(2)(C).

## 1. Lane's Claim Regarding Sufficiency of the Evidence

Lane contends there was insufficient evidence of one element of the crime - that he participated in Berg's killing because Berg had been "enjoying employment, or any perquisite thereof."  We disagree.

22

One witness, Cunningham, who was writing an article on the Aryan Nations compound in Hayden Lake, Utah, testified he spoke with Lane several times during his visits to the compound. Lane told Cunningham that he had been run out of Denver by a talk-show host who spoke out against their organization and the Ku Klux Klan.[15]

Another witness, Zillah Craig, the daughter of Lane's codefendant Jean Craig, testified that she spoke with Lane at a social gathering. Lane expressed to her his dislike of Berg and the way Berg put down the white race on his radio show.[16]

Denver Parmenter also testified regarding a meeting he attended with Lane, Pierce, Bob Mathews, and six other men at Mathews' property in Metaline Falls, Washington. The group

---

[15]

> Q. At that fourth visit in the middle of October did David Lane say anything to you relative to experiences he had in Denver, Colorado?
> A. We discussed his activities in Denver and the fact that he had been run out of Denver by the people and in particular by a talk show host who was very anti their organization and the Klan and spoke out against them.
> Q. And that was what David Lane told you?
> A. Yes.

XI R. 65.

[16]

> Q. What did Lane say about Alan Berg?
> A. He expressed how much he didn't like him. He thought he was a real threat to the white race. He didn't like he put him down on his radio show.
> Q. David Lane didn't like he put who down on his radio show?
> A. Didn't like the way Alan Berg would put down the white race.

XVI R. 106.

discussed their goal of attacking Jewish power in the media by assassinating Jews who were in a position to influence society.[17]

Randall Rader testified that on June 14, 1986, four days before Berg was killed, he had a conversation with Lane at Mathews' property in Metaline Falls, Washington in which Lane told him a talk-show host in Denver was going to be killed because he derided a Ku Klux Klan member on the radio.[18]

---

[17]

    Q. Please describe to the jury what happened at the meeting of the nine men.
    A. Bob Mathews led the meeting, presented the presentation that he had prepared which consisted of six steps which delineated the methods in which the group would proceed, and as he provided the steps one by one they would be discussed by the group, and basically after they were discussed they were agreed upon and the group was formed.
    Q. What were the subgoals?
    A. They were more immediate goals of forming a covert organization, a vital one, which would be strong enough to attack the institutions where the Jewish power was thought to exist, the political-social institutions, again particularly the media . . . .
    Q. Was there specific discussion of the fifth step of those six steps?
    A. Yes, there was.
    Q. What was the fifth step?
    A. Assassinations.
    Q. What was said about the assassinations?
    A. Assassinations were thought to be one of the means by which we could carry on our goals. It first would attack the Jew and particularly the Jew that was in a powerful position or in a position to influence society . . . .
    Q. And beside Bob Mathews, was there any particular person more vocal than the others?
    A. I think that David Lane probably contributed more than anybody else to the meeting. . . .
VIII R. 69-71.

[18]

    Q. Did Mr. David Lane tell you that someone was going to be killed in Denver?
    A. Yes, sir.

(Footnote continued on next page)

24

We think this was sufficient evidence from which a rational jury could have found beyond a reasonable doubt that Berg came to Lane's attention because of his employment as a radio talk-show host, that Lane disliked Berg because of the way Berg used his employment as a radio talk-show host to deride beliefs Lane held dear, and that Lane participated in Berg's killing to prevent him from continuing to perform his employment in a way Lane found offensive. Consequently, we reject Lane's challenge to the sufficiency of the evidence.

## 2.  Pierce's Claim Regarding Sufficiency of the Evidence

Pierce contends there was insufficient evidence of each of the three elements of the crime. Again, we disagree.

First, Pierce contends there was insufficient evidence that he participated in Berg's killing -- that is, that he "by force or threat of force willfully injure[d]" Berg. 18 U.S.C. § 245(b). The government introduced the following evidence, and more, to establish that Pierce participated in Berg's killing.

Denver Parmenter testified that Pierce was present at the September 1983 meeting at which the Order was formed and participated in the discussion of a plan to assassinate prominent Jews. VIII R. 70-71. He testified Pierce was also present at the June 1984 meeting during which Berg was discussed as an assassination target. VIII R. 98. (Lane was not present at this

---

(Footnote continued):
        Q.  What did he say?
        A.   He  said a talk show host was going to be
killed because he had said bad things on the  radio
[about] a Ku Klux Klan member.

meeting).    At that meeting Pierce "indicated he would be happy to participate."  VII R. 106.

The government also introduced evidence that on June 15, 1984 Pierce, using a false name, made reservations at a Denver motel for the nights of June 16, 17, and 18, 1984.  Berg was killed on June 18.   Also, the government's ballistics expert connected shells and bullets from the crime scene with others found at Pierce's home.  XI R. 36-41.

Zillah Craig testified that at 7:00 a.m. on June 18 Mathews telephoned her and said "He and some others were going to Denver to kill Alan Berg."  Then at 1:00 a.m. on June 19 Mathews was dropped off at her Laramie, Wyoming house.   XVII R.  10-11.   He said he and others had killed Berg in Denver.  XVII R. 11.  Later that morning Pierce came over and the three of them "sat round" reading articles about the Berg killing.  XVII R. 12.

Later, in September 1984, Pierce told Parmenter that "when Alan Berg was shot he dropped as if a carpet had been pulled out from under him."  VIII R. 123.  Pierce also told Kenneth Loff that he had killed Berg with a MAC-10.  XXI R. 56-57.  Pierce told Loff that Berg "didn't make a sound, went right to the ground."  XXI R. 57.

This summary does not contain all the evidence the government presented to prove that Pierce participated in Berg's killing. But after reviewing the whole record, we are convinced that there was sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that Pierce participated in Berg's killing.

Second, Pierce asserts there was insufficient evidence that he participated in Berg's killing because of Berg's race or religion -- that is, because Berg was Jewish. 18 U.S.C. § 245(b)(2). The government introduced the following evidence to establish that Pierce participated in Berg's killing because Berg was Jewish. As discussed above, Pierce was present and participated in the September 1983 and July 1984 Order meetings. At the September 1983 meeting the members discussed a general plan to assassinate prominent Jews. At the June 1984 meeting Berg was specifically discussed as a target. Pierce told Denver Paramenter "that Jewish people are the people of the Devil, that they needed to be destroyed." VIII R. 109.

The government also introduced evidence of numerous anti-Semitic statements made by Mathews. Pierce cites this evidence in an apparent attempt to show how little evidence there was against him compared to others. His attempt, however, is self-defeating because Mathews' statements were all introduced by stipulation against Pierce under either the co-conspirator or statement-against-interest exceptions to the hearsay rule. In one statement Parmenter testified that Mathews said he "wanted to kill Berg to shut him up because he was Jewish and his views were counter to the radical right revolutionary movement." IX R. 47. We think there was sufficient evidence from which a rational jury could find beyond a reasonable doubt that Pierce participated in Berg's killing because Berg was Jewish.

Third, Pierce contends there was insufficient evidence that he participated in Berg's killing because Berg was "enjoying

27

employment, or any perquisite thereof, by any private employer
. . . ."  18 U.S.C. § 245(b)(2)(C).

To establish that Pierce participated in Berg's killing
because Berg had been enjoying employment, the government
introduced evidence that at the June 1984 meeting the group,
including Pierce, discussed creating an organization that "would
be strong enough to attack the institutions where the Jewish power
was thought to exist, the political-social institutions, again
particularly the media." VIII R. 70. Denver Parmenter testified
that assassinations were disscussed as "one of the means by which
we would carry on our goals. It would first attack the Jew and
particularly the Jew that was in a powerful position or in a
position of influence in society." VIII R. 70. Further, the only
reason Berg came to the attention of any of the group's members
was because he ridiculed the right—wing extremist groups on his
radio show.

We are convinced there was sufficient evidence from which a
rational jury could conclude beyond a reasonable doubt that Pierce
participated in Berg's killing because Berg had been enjoying
employment or its perquisites. In sum, we hold there was
sufficient evidence from which a rational jury could conclude
beyond a reasonable doubt that Pierce violated § 245(b)(2)(C).


### E.  Denial of Severance

Lane and Pierce both argue that the trial judge abused his
discretion when he denied their motions for separate trials.
Further, they contend that their joint trial was the genesis of
other constitutional errors.

28

## 1. Motions for Separate Trials Under F. R. Crim. P. 14

Lane and Pierce were properly charged in the same indictment because they were "alleged to have participated in the same act . . . or in the same series of acts . . . constituting an offense . . . ." F. R. Crim. P. 8. Before trial, however, both Lane and Pierce filed motions for separate trials alleging they would be "prejudiced by . . . a joinder for trial together . . . ." F. R. Crim. P. 14. I R. 33, 63. They now argue the trial judge committed reversible error when he denied their motions. Supp. I R. 10.

If two or more defendants have been properly joined in the same indictment under Federal Rule of Criminal Procedure 8 and it appears that one or more of the defendants will be prejudiced by a joint trial, Federal Rule of Criminal Procedure 14 provides that "the court may . . . grant a severance of defendants or provide whatever relief justice requires." In exercising this discretion, the trial judge should balance the prejudice to the defendant caused by a joint trial against the expense and inconvenience of separate trials. United States v. Hack, 782 F.2d 862, 870 (10th Cir. 1986). The judge should consider other remedial measures that will minimize the apparent prejudice to the defendants. See F. R. Crim. P. 14. A trial judge's denial of a motion for a separate trial should be reversed only if a defendant establishes that he was actually prejudiced by the joint trial and that the trial judge abused his discretion in denying the motion. United States v. Wright, 826 F.2d 938, 945 (10th Cir. 1987).

Both Lane and Pierce contend that they were actually prejudiced because the evidence introduced in their joint trial was such that the jury inevitably and impermissibly considered some evidence against them that had been admitted only against their codefendants. If all the evidence in a joint trial of defendants was admitted against each codefendant, no such prejudice could result from the joint trial because the evidence would be precisely as it would at each defendant's separate trial. In most joint trials, however, some evidence is admitted against some codefendants that is not admissible against others. This situation may create a danger that evidence introduced only against some codefendants will be impermissibily considered against others -- that is, that it will "spill over" or "rub off" onto them. Such a result would violate a cardinal rule of our criminal law that "[g]uilt with us remains individual and personal." Kotteakas v. United States, 328 U.S. 750, 772 (1946).

One primary means used to insure that each defendant receives individualized consideration by the jury is the limiting instruction. In such instructions the judge admonishes the jury to consider certain evidence only against the codefendants against whom it was admitted, and not against the others. One of the many limiting instructions given by the trial judge in this case was as follows:

> Members of the jury, here and at other times during this trial I should remind you . . . about how this is four trials in one and how at times some evidence is to be limited in your consideration. This witness has talked about David Lane in his testimony and the testimony relates only to David Lane and cannot be considered by you with respect to any other defendant in the case, so the evidence is specifically limited to David Lane.

XI R. 67.

As a general rule, we presume that juries follow such instructions. "The rule . . . is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process." Richardson v. Marsh, 481 U.S. 200, 211 (1987). Other typical means employed in this trial to accommodate the accused's interest in individualized consideration of guilt and the government's interest in judicial efficiency include redaction of out-of-court statements by codefendants to eliminate reference to other codefendants, and exclusion of evidence.

We turn now to Pierce's and Lane's arguments that the denial of severance was reversible error.

### a.  Pierce's motion for severance

Pierce argues that the quantity and the quality of the evidence introduced against his codefendants was such that the jury could not "compartmentalize" it as to each defendant. He says that this impermissible "spill over" actually prejudiced him.

Three protective measures were taken in this joint trial to minimize the risk that the jury would impermissibly consider evidence against Pierce that had been admitted only against his codefendants. First, the out-of-court statements by each codefendant were redacted to eliminate any reference to the other codefendants. I R. 69, Item 5. Second, the trial judge constantly admonished the jury to consider each codefendant's

out-of-court statements only against that codefendant, and not to consider them against the other codefendants. Third, the trial judge excluded several of Lane's anti-Semitic statements because some were so inflammatory and some so cumulative that their admission might prejudice the other defendants. Pierce argues that he was nevertheless actually prejudiced by the joint trial because the evidence was still such that the jury inevitably and impermissibly considered evidence against him that had been admitted only against his codefendants.

Pierce cites United States v. Mardian, 546 F.2d 973 (D.C. Cir. 1976), in which the court of appeals reversed Mardian's conspiracy conviction, holding that the trial judge abused his discretion when he denied Mardian's motion for a separate trial. The court noted two types of prejudicial situations that may be present in a joint trial. First, "[p]articularly where there is a great disparity in the weight of the evidence, strongly establishing the guilt of some defendants, the danger persists that guilt will improperly 'rub off' on the others." Id. at 977. Second, the court noted that this danger is present "when the evidence against one or more defendants is 'far more damaging' than the evidence against the moving party." Id. See also United States v. Sampol, 636 F.2d 621 (D.C. Cir. 1980). In addition, severance may be required where the defenses of defendants are so antagonistic that they are mutually exclusive. United States v. Rodgers, ___ F.2d ___, (No. 88-1113 10th Cir. 1989) (slip op. at 27).

We cannot agree that Pierce was exposed in this joint trial to these dangers. First, Pierce was not prejudiced because of a

32

disparity in the weight of the evidence introduced against each defendant. The weight of the evidence against Pierce and Lane was approximately the same. More evidence was introduced against Pierce and Lane than against Craig, and very little evidence was introduced against Scutari.

Second, the evidence against Pierce's codefendants was not far more damaging than the evidence against him. Pierce refers to numerous anti-Semitic, threatening, and inculpatory out-of-court statements by his codefendants that were admitted against his codefendants under the statement by a party exception to the hearsay rule. As such, they were admitted only against the defendant who made them, not against the other codefendants, and so would not have been admissible at Pierce's separate trial. Pierce contends that these statements were so "inflammatory and prejudicial" that the jury inevitably considered them against him.

Even if Pierce had been tried separately, however, he would not have been shielded from the allegedly "inflammatory" character of the motivations and actions which comprised this crime. Denver Parmenter testified that Pierce told him "that Jewish people are the people of the Devil, that they needed to be destroyed." VIII R. 109. Pierce also told Parmenter that "when Berg was shot he dropped as if a carpet had been pulled out from under him." VIII R. 123. Regarding the founding members of the Order, including Pierce, Pierce told an FBI agent that "the Northwest United States would be a territory that this group would want to bring into their power and control -- as Mr. Pierce explained it to me, an area of the last bastion of white

33

predominance." X R. 80. Kenneth Loff, another Order member, testified about statements Pierce made to him regarding Berg's killing:

> Q: Did Mr. Pierce say anything about Alan Berg?. . .
>
> A: He said he killed him.
>
> Q: Did he explain what he used to kill Alan Berg?
>
> A: He said he used a MAC-10.
>
> Q: Did Bruce Pierce describe anything about the MAC-10 at that time?
>
> A: That it jammed on the 14th round.
>
> Q: Did he explain anything else about the Alan Berg killing?
>
> A: That he didn't make a sound, went right to the ground.

XXI R. 56-57.

We recognize that the evidence did contain more anti-Semitic remarks by Lane than by Pierce. But Lane's comments were not more damaging than Pierce's. Pierce also alludes to the damaging out-of-court statements made by Mathews that were introduced at the joint trial. These statements may have been damaging to Pierce, but they caused him no prejudice that would have been cured by a separate trial. They were admitted against him and would have been admissible even at his separate trial.

We hold Pierce was not actually prejudiced by the joint trial and that the trial judge did not abuse his discretion when he denied Pierce's motion for a separate trial.

34

### b. Lane's motion for severance

Lane contends that the "weight, quantity, and type of evidence" introduced against Pierce, Scutari, and Craig was so "voluminous, complex, and interlocking" that it was impossible for the jury to "compartmentalize" it as to each defendant. Brief of Appellant Lane, 21-22. Like Pierce, he argues that this impermissible "spill-over" inevitably resulted in his conviction.

Specifically, Lane argues that the quantity of evidence against his codefendants was so voluminous compared to the evidence against him that it improperly "rubbed off" on him. As in Pierce's case, this argument is not supported by the record. The weight of the evidence against Lane and Pierce was approximately the same. More evidence was introduced against Pierce and Lane than against Craig, and very little evidence was introduced against Scutari. Lane was not prejudiced because of a disparity in the weight of the evidence introduced against each defendant.

Lane also argues that the government portrayed Berg's killing as a "group effort" and the only way to have safeguarded Lane from the evidence of "group guilt" would have been to grant him a separate trial. But if the evidence tended to show that Berg's killing was planned and executed by more than one person -- that is, that it was a group effort -- there is no other way the government could portray the case. Lane has not attempted to demonstrate how a separate trial would portray the case differently. Lane does refer to statements made by Mathews, the deceased leader of the group, which tend to portray Berg's killing as a group effort. Lane, however, simply cannot have

35

been prejudiced by admission of these statements at the joint trial; they were admitted against him and they would have been admissible even at his separate trial. I R. 69, Items 4 & 7. Finally, the group nature of the crime was revealed by Lane's own statement. Kenneth Loff testified that Lane himself said: "We shouldn't have killed him because we made a martyr out of him." XXI R. 59 (emphasis added). Lane was not unfairly prejudiced by the way the government presented its evidence.

Lane further contends he was actually prejudiced by the type of evidence introduced against Pierce: spent shells connected to the murder weapon; silhouette targets; books entitled "How to Kill"; and Pierce's damaging admissions. We do not think Lane was prejudiced by this type of evidence. The physical evidence was simple and we think the jury could compartmentalize it and limit it to Pierce. Pierce's inculpatory statements likewise were unlikely to prejudice Lane. They were redacted to eliminate any reference to Pierce's codefendants, I R. 69, Item 5, and the trial judge constantly reminded the jury to consider each defendant's statements only against that defendant. The type of evidence introduced against Pierce was not so complex or confusing that the jury inevitably considered it against Lane.

As noted earlier, the jury acquitted Scutari and Craig, demonstrating its ability to consider the defendants separately. We hold that Lane was not actually prejudiced by the joint trial and the trial judge did not abuse his discretion when he denied Lane's motion for a separate trial.

36

## 2.  Bruton claims

Pierce and Lane also contend that admission at their joint trial of certain out-of-court statements by their nontestifying codefendants, which were admitted only against those codefendants and not against Pierce or Lane, violated their Sixth Amendment right to confront witnesses against them as defined in the rule of <u>Bruton v. United States</u>, 391 U.S. 123 (1968).

Both Pierce and Lane refer to one statement by Craig.  During the direct examination of FBI agent Keyes, he recounted a statement Craig made to him during an interview at her home:

> Q:   Agent Keyes, during that interview did you ask Miss Craig why <u>The Order</u> killed Alan Berg?
>
> A:   Yes, sir, I did.
>
> Q:   What was her answer?
>
> A:   She advised that he was killed because of his statements and beliefs.

XIX R. 83.

Pierce further refers to one statement by Scutari and two by Lane.  John Lamers, Scutari's roommate during late 1985 and early 1986, testified regarding a conversation he had with Scutari while they were at their apartment "drinking some wine":

> THE WITNESS:   I recall that he asked me if I knew of if I had heard about some -- I don't know if it was a disc jockey or talk show host or what, but some Jewish -- at the time he may have said disc jockey or he may have said talk show host, I don't know, but he asked me if I had heard about it and I said no, I hadn't, and he mentioned <u>The Order</u> was involved and was responsible for it, and I stopped him before he got too involved in the details because I didn't want to know about it.

XX R. 69-70.

Mark Jones, an Order member, testified regarding a comment Lane made during an automobile trip from Alabama to Montana in November 1984:

> Q: [D]id Mr. Lane say anything about Alan Berg?
>
> A: He said talking about Mr. Berg how much trouble he was making in Denver for the right wing movement and that some night he got off work and he was met by a couple of men and he got what he deserved.

XVIII R. 136-137 (emphasis added). Kenneth Loff, another Order member, also testified that Lane told him: "We shouldn't have killed him because we made a martyr out of him." XXI R. 59.

We think that the admission of these four statements at the joint trial was not reversible error for two reasons. First, the statements fall within the terms of the following stipulation in which Lane and Pierce agreed not to object to the admission of certain statements:

> 5. The government agrees to redact specific references to co-defendants from statements made by defendants that will be offered solely as admissions by party-opponents under Rule 801(d)(2) of the Federal Rules of Evidence. The defendants agree not to object to admission of these redacted statements offered solely as admissions.
>
> 6. The defendants agree that the redaction of statements referred to in . . . statement[] . . . 5 will not include the deletion of references to actions by the declarant and other unnamed persons. Statements referring to what "we" did will not be redacted to eliminate the word "we."

I R. 69.

The statements in which Lane referred to "a couple of guys" and "we" clearly fall within the terms of the agreement by which

38

the defendants and the prosecution agreed that redaction of these statements "will not include the deletion of references to actions by the declarant and other unnamed persons" nor elimination of the word "we." The statements in which Craig and Scutari mention "The Order" also seem to fall in the "unnamed persons" category, even though the jury had been apprised by other witnesses that Lane and Pierce were members of The Order. However, we need not decide that question because of the further reason that follows.

The second reason that the admission of these statements at the joint trial was not reversible error is that defense counsel did not object to admission of the statements at trial and consequently this alleged error was not properly preserved for appeal. Moreover we are satisfied that the admission of these statements was not plain error.

We hold that admission of the statements in question at the joint trial was not reversible error.

### 3.  Cross-examination of Randall Rader

Lane contends that the trial judge violated his Sixth Amendment confrontation right by restricting his cross-examination of Randall Rader. The ruling in question appears in the following portion of the record:

> Q.   Isn't it true that Richard Scutari told you that he drove the Berg getaway car?
>
> A.   No, sir.
>
> Q.   It is not true?
>
> A.   I don't believe it is . . . .

Q.    Do    you    remember telling . . . Detective
Michaud, you told him, talking about you,    that    he
drove the car on the mission?

A.    I    don't recall, but it's a possibility I
said it . . . .

Q.    Do you recall    telling    that    to    Special
Agent Davis . . .?

A.    No.

Q.    Do    you    remember    testifying    in    Seattle
that you had a conference with Mr. Scutari?

THE COURT:  Mr. Bender, you are questioning in
an  area that is prejudicial to Mr. Scutari . . . I
want you to read the question and the  answer   into
the   record   . . . as to what the testimony [at the
Seattle trial] was so that is clear . . . .

MR. BENDER:  Question:  At some time you  were
told   that   Mr. Scutari was the one that had driven
the vehicle in Denver, correct?

Answer:  Yes.

THE COURT: Now next question.

Q.    Did Mr. Scutari tell you that? . . .

A.    No.

The   Sixth   Amendment's   Confrontation   Clause    provides    a
constitutional    foundation    for    the    right    to   cross-examine
witnesses.    <u>Davis v. Alaska</u>,    415    U.S.    308,    315-17    (1973).
However,   "[t]he   extent   of   cross-examination   with   respect   to an
appropriate subject of inquiry is within the sound discretion  of
the   trial   court."    <u>Alford   v. United States</u>, 282 U.S. 687, 694
(1930); <u>United States v. Valentine</u>, 706 F.2d 282, 288 (10th   Cir.
1983).

Here   Rader's   prior   statements   were   obviously   an   appropriate
subject   of   inquiry   if   they   could   impugn   the    government's
contention   that   Lane was driving the getaway car.  To this end,

40

Lane's counsel was trying to get Rader to acknowledge he had told someone that Scutari had admitted driving the getaway car. Rader clearly answered "no." The restriction the trial judge imposed only prevented Lane's counsel from paraphrasing Rader's testimony at the previous Seattle trial in a way unfairly prejudicial to defendant Scutari, who was also on trial. Lane's counsel was not prohibited from asking a question, merely from mischaracterizing Rader's prior testimony. We think it was within the sound discretion of the trial judge to limit Lane's counsel's cross-examination of Rader to this extent. Lane's confrontation right was not violated.

### III

No reversible error has been demonstrated and accordingly the judgments are

**AFFIRMED.**